All right. Our fourth case for this morning is United States against Antonio Walter and Kenneth Bell. Mr. Brindley. May it please the court. My name is Beau Brindley and I represent the defendant appellant Kenneth Bell. At the district court during his trial, Mr. Bell argued that the government would not be able to present any evidence of his participation in the charged conspiracy that did not come from cooperating individuals who would be significantly discredited. During the course of the government's case and Mr. Bell's cross examinations, this was established. All of the witnesses who claimed personal knowledge of Mr. Bell's selling heroin as part of the charged conspiracy were significantly discredited. They contradicted each other. They contradicted themselves. This is not the first time that's happened, by the way, you know, in this type of conspiracy. Certainly not, Judge, but with that as the backdrop, the thing that is different is then the government put into evidence an unrelated controlled purchase of heroin. But that's because the defense counsel invited testimony that this very broad investigation had taken place and that nobody ever saw Mr. Bell doing something wrong. And had the court not permitted the correction of the record on that point, the jury would have been left with a very misleading picture. And the court cautioned that the purchase that was observed was not part of the conspiracy in this case. And, Your Honor, I think the important thing here is the only things that counsel for Mr. Bell put into evidence was, in fact, a laundry list of investigative techniques that were used. And, in fact, the opening statement language was specifically tailored to prevent any improper inference that it was all about his participation in the charged conspiracy. There was no evidence. Despite the extent of this investigation, all the techniques, there was no evidence that Mr. Bell participated in this charged conspiracy. And there should have been. I'm sorry, Judge. I was going to say, it seems to me like it was a judgment that the district court simply had to make. I'm aware of the language that you're suggesting, but the jury could have heard that as a blanket statement that there was no incriminating behavior on the part of using these techniques, however you want to phrase it. And that simply wasn't right. And I don't think this is something that Gomez rules out. This is not a propensity issue at all. It's like, did X happen? And that's all there was. Isn't it correct, however, Mr. Brindley, that the district judge made this call based on a misunderstanding and misstatement by the prosecutor about the actual language used in opening? Yes, Your Honor. And that was pointed out before the district court. The government suggested that the argument that Mr. Bell was going to make was simply different than what he had. In opening statement, Mr. Bell specifically said, there are all these techniques, and there was no evidence that you'll find that Mr. Bell participated in the charged conspiracy. And we went on in opening statements to say that this isn't about some other transaction or that he never committed some drug transaction on another case. It's about this charged conspiracy. We did everything we could to prevent the invited error. And Gomez still applies. This court, in Curtis and in Schmidt, has had invited error arguments and applied the Gomez analysis. When the district court said Gomez is inapplicable, that was an error of law. And it was an error of law. No one ever indicated what fact of consequence was made more or less probable. In every one of the cases the government has cited in its response brief, the defense presented affirmative evidence that went to an element of the case. Why isn't correcting the record, if the record gives the impression that X never happened, that X actually did happen, why isn't correcting the record a valid purpose? I don't see why that's a propensity purpose. Well, I think you have to think about it another way, Judge. Every time you go to court and you have a prior act that's not admissible, the jury's going to automatically, there's a good possibility they'll infer he never committed any drug crime in the past. That's not prejudicial to the government that the jury might speculatively make that inference when never argued for, when never asked to. That's just a totally different situation. That's not prejudicial. Are you assuming the jury just didn't follow the actual instruction that the district court gave? The instruction said you can consider this only as a rebuttal to evidence about the investigation. This purchase was not part of the conspiracy. So she's telling the jury you can't look at this purchase as part of the conspiracy, and you think they just ignored it. No. I think that if they followed it, they had a big problem. Because the only evidence Mr. Bell put on about the investigation, as far as any reasonable juror can understand, was that the investigation didn't indicate that Bell committed the charged conspiracy or participated in it. And this, she says, you can consider the prior act to rebut that evidence. The jury then can think, well, then we consider that to determine whether he's guilty of the charged offense, whether he did it. He says the investigation doesn't indicate that. And the other thing she didn't do, Your Honor, is what Gomez says. She didn't give any of the limiting language, saying you can't use it for other purposes. She didn't do that. We had asked for an instruction that basically said you should disregard it because it can't be used to show the defendant's guilt in the charged conspiracy. And even when trying to determine what the purpose was, when talking to the government, the judge said, well, based on the language she ultimately did give, she said that language seems kind of wishy-washy. What's the purpose? And no one could ever really identify a good purpose for putting it in. And the only one that's ever been identified is let's try to prevent the speculative possibility that a jury might conclude what they could easily infer if none of this was ever put in, that he'd never committed a prior drug crime. They might do that. And the idea that that opens the door for the admission of a prior drug crime in a heroin conspiracy case, that has never been indicated in any prior case law before this Court. Every other case has had affirmative evidence from the defense that went to an element, not an unargued and unbidden possible assumption that the jury could make. Mr. Brindley? Yes. In your opening statement, I'm quoting from I think page 46. You said, that evidence will show you how Mr. Bell had some of the money that he had, but ultimately keep in mind the government's burden in this case is to prove that he's guilty of conspiracy, not that he had money. Not that he may have sold heroin on a couple of occasions, but to prove that he was, as they put it, the CEO of this conspiracy. What was the reference to may have sold heroin on a couple of occasions there? Well, we didn't know exactly what the cooperating witness evidence would be. Our argument in the case was that they couldn't prove that Mr. Bell conspired with these people to sell heroin. If the jury were to have found that there was some unrelated heroin sale or come to that conclusion for some reason, we wanted to say, look, that's not what this is about. And the other thing we were doing, Judge, was really trying to avoid this invited error issue and say, look, this is about the charged conspiracy. The government agreed not to put that in, and we were trying to steer clear of it. And we thought that we had by using exactly the right language. And then when we gave a laundry, the invited error doctrine says you put in inadmissible evidence. Then you can do something else. Or if you make an improper argument for him, we didn't argue for the improper inference, and everything we put in was admissible. They didn't object. When we didn't draw special attention to these controlled purchases, it was just one in the list. So this is an extensive investigation. If it was this extensive and the cooperators really saw him there all these times he's supposed to be there, they would have seen him too. And that's perfectly permissible. Mr. Bradley, before your time runs out, I'd like you please to address as concisely as you can the issue of whether the argued 404B error was harmless. And in particular, the government didn't do anything with it in closing. It just came in. The jury got the instruction for whatever that meant. Could you address that issue? Yes, Your Honor. I can. The three witnesses, Nesbitt Forrest and Scott, who were the only ones with personal knowledge claimed of Bell supplying heroin, were savagely hurt by inconsistencies and savagely hurt by not corroborating but, in fact, contradicting each other. When you are facing that, there's reason to doubt. And then when you inject into that the only objective proof that he ever sold heroin that's undeniable because of its controlled purchase, you inject that into it and then you're in a position, Your Honor, from which it's almost impossible for the jury to say, well, he did before so he must have done it later. And with that in mind, I want to highlight one thing for the court. The one thing the jury asked for, and this is at page 1,353 of the October 24 transcript, they asked for a single video. And if you go back and look at the record, the video they asked for was at a particular address, and it was of Mr. Walter with Mr. Bell. It was the same address where the controlled purchase took place. So there is evidence suggesting that what the jury may have been thinking was indeed, well, when he was at that address before he sold drugs, when he and Walter were there, they must have been selling drugs. The video of the controlled buy from Bell was never admitted, was it? No. But the address was put in the record. And that's the only video they asked for which was put into Evans in our case. With that, I will reserve any remaining time. I think you've run out, but I'll see if I need to give you more. You'll just have to see. Yes, Your Honor. Mr. Hatchell. Thank you, Your Honor. May it please the Court, Eric Hatchell from Foley & Lardner on behalf of Mr. Antonio Walter. Mr. Walter presents two issues on appeal. First, it's whether the government's admitted failure to turn over favorable evidence is material under Brady. And second is if the Court agrees with the discussion you were just having with Mr. Brindley about the other act evidence that was admitted related to Mr. Bell, what does that do to Mr. Walter? And since we were discussing that first issue, I will turn to that second issue right now. In Zaffiro v. United States, the United States Supreme Court recognized that when evidence of a co-defendant's wrongdoing is admitted, in some circumstances it could lead to a jury to conclude that the other co-defendant was also guilty. And that's the point and the reason we cited Zaffiro. The government correctly points out that that was a severance case. We're not citing it for that purpose. There was no severance requested. We're merely pointing out that the way this case was charged against Walter and Bell, there was a single indictment naming both of them, charging that they conspired together. The government stressed throughout the trial, including in closing argument, that Walter and Bell worked together on this conspiracy. So, I mean, you have briefed this point. I think it's a hard point for you to make given the lack of a request for a severance and the fact that this was a conspiracy. I would like you to say a word or two about the district court's decision on the Nesbitt admissions that the supposedly suppressed evidence just wasn't material enough to make a difference. On the Brady issue? On the Brady issue. Yes, absolutely. I can tell you that. And so it goes to materiality, of course, right? The government admits that this was favorable evidence. Right. It's impeachment, at least. Right. And they dispute a little bit that it's suppressed. But on the issue of materiality, it's material for two reasons. First, it goes directly to the credibility of key witnesses, the key witnesses of Forrest and Nesbitt. But they're both seriously impeached, right? In part, yes, Your Honor. But the point is at least it relates to Mr. Walter. Nesbitt and Forrest carried in the most evidence of guilt. There was other evidence of other witnesses, but it was very minimal. So if you're looking at what the jury considered, they saw these two witnesses that talked the most about the guilt. But you have this exchange about Forrest. Is Edmund Forrest still out on Chicago and Christiana? Nobody thinks he's sunbathing out there. That surely means selling drugs. And there are plenty of other things, just given Forrest's record, that impeach him. Perhaps. The point is that without the evidence that the government didn't turn over, that point wasn't able to be made as clear as defense would have liked. Your strongest argument on materiality, I thought, depends on whether the government knew or had information, not just that Forrest was, quote, still out on the corner, but that Nesbitt and Forrest were still working together at the time of trial, right? Absolutely. The government says they didn't know that during trial, and I didn't see a direct response to that. Could you address that issue? I disagree. I think if you look at the letters, the way that the defense learned of this information was letters sent to them after trial. We cite those. They're certainly in the record. And in that, it certainly says, I believe in those letters, I don't have them in front of me, but that the government knew of this, and they didn't learn of it after trial. They learned of this during trial, and they learned of it only a few days after defense was making a point about this issue. Well, those letters, I mean, they're at the back of the briefs. So the December 18 letter talking about Agent Dunn says that Nesbitt told Dunn that Forrest is still selling drugs and is at the table on a regular basis. I'm not seeing. I guess if you look at page 6 of this would be Walter's opening brief, I think you're referring to the first letter, which is. Well, I'm looking at the letters, the letters themselves. There's a December 18 letter, a February 10 letter, and a July 8 letter. And I'm just trying to drill into whether these letters are saying that Nesbitt says, I'm helping. Now, maybe the second letter does, but this isn't until long after the trial. Nesbitt knows this because Nesbitt saw Forrest at the table two or three times. They're mixing heroin for that particular spot. There's an apartment. Nesbitt is running bundles and working packs. He gave Forrest some money. So based on conversations, Nesbitt believes that Forrest may have been at the table for Chicago-Christiana prior to June as well. I don't know. And I think the conclusion is because they worked together in the past, the fact that he's telling the government shows that they were working together at this time as well. But returning to the point about defense had raised this issue because Nesbitt was disclosed as a witness immediately before trial. And the defense raised this issue to a motion to continue the trial based on that late disclosure, saying that they were prejudiced because they didn't have an opportunity to fully investigate his role, and they were concerned that Nesbitt and Forrest may be working together to conspire against Walter and Bell. And the fact is that they were admitted to the government. The government learned during trial that they were selling and involved in the sale of heroin, while at the same time working with the government to convict Bell and Walter at the very same street corner. So certainly, had the defense had that information at the time, it would have been excellent impeachment of their credibility. It would have been additional material to tell them. But cumulative, for sure. Well, I think it's highly relevant that the fact that it's the same street corner that they are selling and involved in a heroin conspiracy themselves, while at the same time they're trying to throw someone else in prison for the same charge. It could certainly show that somebody else, they're trying to protect somebody else. We raised this in our brief. We have this Kmart idea, but it seems odd to me to think that only one person in the universe would be supplying heroin for that corner. Apparently, it's like a big heroin marketplace, right? Maybe other people step into the void when Walter and Bell are out. I'm sorry, I don't mean to talk over you. No, no, go ahead. The point is defense didn't have an opportunity to let the jury make that decision. That's the decision that should have been left to the jury to decide, not for us to speculate. And the point is the defense would have had that opportunity if the government simply would have turned over this information. They don't explain why they didn't do it because they can't. They learned that defense wanted this information multiple times, including two days before they learned it. Yet they didn't do anything until after trial when it's of no use. I'll reserve the time I have left. All right, sure. Mr. Madden. Thank you. So why didn't the government just tell the defense about the Dunn disclosure when it happened? It seems like such a misstep. Your Honor, on that issue, the information that the government – I guess I want to correct the record on that issue. First, because of what was just said by Walter's attorney. And then second, from what I saw on page one of Walter's reply brief. It's an issue that I think you all raised through your question of him, which is exactly what did the government learn during trial. And here's what we did learn. It's that the letter that was set forth in the government's brief, which is on page 44, what we learned is that Nesbitt told Agent Dunn that Forrest was selling drugs at the table on a regular basis. That's one. Then that he was selling those drugs for someone named Kmart. And then third, that they were using an apartment near Chicago in Spalding. Those were the three facts that the government learned. First, from a conversation between Nesbitt and Agent Dunn, I think while he was outside Judge Bucklow's courtroom during some break during his testimony. So that's what the government learned. And what you see from Walter's brief and what Walter's attorney has been saying here is that the government learned during trial that Nesbitt and Forrest were selling drugs together at the same location. Nesbitt didn't say anything about himself. It's not much of a leap, though, is it, from Nesbitt saying that Forrest is at the table? How else does Nesbitt know that? They've known each other their whole lives. Nesbitt's been involved in drug dealing his whole life. Nesbitt had actually been in the lead-up to the trial. I mean, maybe you could assume that, but Nesbitt had many reasons, many different ways. He could have had a basis of that knowledge. It would be the natural question, right? Yes. The first question that the defense would want to pursue, right? So why not disclose this? I think it's not in the record, but I can explain it to the court if you'd like me to. Did the issue come up in the district court? Did you explain it there? No. See, and the problem is that by the time you get to this February 10 letter, which you've reproduced, I was looking at the original of it a minute ago, you have the exact kind of additional information that Judge Hamilton is talking about. Nesbitt's talking about running bundles, working packs at that corner. He's talking about giving Forrest money from heroin sales during that period. It's, you know, pretty easy to tie Nesbitt in. Yeah. I mean, we would have been assuming that, but we simply did not know that information at the time of trial. And what I'll say is, you know, as soon as we learned that detailed information, we immediately turned it over, and it wasn't until he pled guilty that he was willing to talk to us about it. The problem is that with Brady information, you've got to look not just at the surface of the information, but about what the defense could do with it. You know, often, for example, Brady information will not be directly admissible, as we and I have said before when I was a district judge. Even if it's not in admissible form as it comes from the government, the defense may be able to pursue and, for example, turn the police report of an interview into the appearance of a witness. So you've got to allow some room for that investigation, and that doesn't seem to have happened here. I guess I'd also like to say that had this all come out as, you know, all of this information that we learned after trial, what we learned both during trial and, let's say, all that information that had come out early the next year, that that information all came out during trial, there would have been no reasonable probability that it would have actually led to a different verdict in that case. And here's a bunch of the reasons why. First, of course, the crux of that, that Forrest was still out dealing drugs, was cumulative of what Nesbitt had already testified to. Not only that, Forrest, of course, was a self-admitted lifelong drug dealer who had admitted to being responsible for 93 kilos of heroin during this conspiracy. Nesbitt himself, the fact that he was out drug dealing, of course, was no surprise. Nesbitt was in his low 30s. He had nine felony convictions. When he pled guilty on that pending case, I think that was his 10th and 11th convictions. So for them to be drug dealers, of course, was no surprise, and the jury heard all about that. In terms of the collusion part. We'll get to the collusion in a minute. But on that point, though, the usual pattern, at least that I see, is that the folks who are cooperating in essence signal, well, now I've seen the light. Right? They testify, that was then, this is now, I've decided to cooperate with the government and tell the truth as I promised to do, and so on. And so the fact that a cooperating witness is still dealing at the time of trial sounds to me kind of qualitatively different. At least there's a pretty good argument to that effect. I guess I disagree. Let's start with Nesbitt. Nesbitt obviously, I mean, he testified in a green jumpsuit from state court. So what that means is that the jury knew, and he didn't testify, yes, I dealt those drugs, but he told the jury, yes, I have nine felony convictions, and I was recently charged with drug dealing. So the jury knew when Nesbitt testified that he likely had recently been dealing drugs after he'd been given immunity by the government and been cooperating with the government. Was that explicit? That he had a pending case for narcotics dealing and he'd just been charged, yes. While he was cooperating with you? Well, the jury heard that he met with us as early as 2011. At that time is when he identified Bell as a co-conspirator, as a supplier, and that he identified Walter. This is on redirect. So that was out there, that the jury knew that Nesbitt had this pending case against them. With respect to Forrest, Forrest had numerous serious violations of bond. And I don't think that they ñ there may have been a few violations after he started cooperating. It's true, though, that the more serious violations of his bond occurred before he started cooperating, which was mostly gun dealing while he was on bond. But I want to talk about why that defense argument on the collusion would have held no water and, truthfully, why they could have made that argument with the evidence that they had, but they chose not to. And here's why. To claim ñ basically, the claim that they've said that they would have made was that these guys got together in 2013 and decided to make up a story about Bell and Walter, and say, A, Bell's a supplier, and, B, Walter's involved in this drug trafficking organization. Well, the government got this information from Nesbitt, Forrest, and Scott and these other witnesses separately and long in advance of 2013 when they incriminated these defendants. And that came into evidence mostly on redirects when the government was putting in prior consistent statements after the defense accused, during very lengthy cross-examinations, accused all of the witnesses of being lying and making this up to please the government. What came out, and this is with respect to Nesbitt, page 1009 of the transcript, Nesbitt in May 2011, when he was interviewed in state prison, he identified Bell as a supplier and Walter for his role in the drug trafficking organization. With respect to Forrest, he pled guilty in his case in March 2012 before he was cooperating with the government. And during his redirect, which was on page 607 of the transcript, Forrest testified that he identified Bell and Walter in his plea agreement before he cooperated as individuals A and B. And individual A was a supplier. Individual B was Walter who Bell was giving the drugs to. Scott, similarly, was arrested long before he was cooperating. This was in November of 2010. And when Scott was arrested, he identified Bell as a supplier. He testified to that on redirect. So all of that, and that was on page 907 of the transcript. So all of these witnesses had separately and long before 2013 identified these defendants as a supplier and also as Walter as a member of the DTO. And one other thing I want to say on that is these cooperators and the people selling drugs at these spots, for the most part, knew each other their whole lives and had been out there selling drugs together for a very long period of time. If they wanted to make that collusion argument, they could have used all of that from 2007, 2008, 2009, 2010. Those guys were out dealing together for years, and they could have, if they were going to collude, they had the relationship, the previous relationship from years, and that was out there. The defense could have made that argument. And then, of course, the defense heard Nesbitt say that Forrest is still out there. The jury heard that, and the defense simply didn't make those arguments. And the reason I think that they didn't is, A, it had no basis in reality, and, B, it would have been very easy for the government to rebut, based on those prior consistent statements that I just mentioned and also other witnesses' testimony. Mr. Madden, I'd like to ask you some questions about the 404B problem as well. Yes. But I'd also like you on, there's a related point here, a perception I have that I'd like you to address, which is there seems to me to be some tension between the government's and district judges' positions on harmless error and materiality with respect to these two issues. And what I mean by that is that the Brady rationale seemed to be, this is not material because the credibility of Scott and Nesbitt and Forrest was already in tatters, right? But the rationale on 404B being harmless seems to be, the rest of our case is so strong. The rest of the case looks like a lot of it is Scott, Nesbitt, and Forrest. Am I misunderstanding the relationships there? Just one, on one point, I think so. So Scott, Jeffrey Scott was not someone who, in terms of the Nesbitt disclosure, had nothing to do with Jeffrey Scott. Right, I understand he's not. Okay, but I take your point on with respect to Nesbitt and Forrest. And I think what the government had said and what the district court had said, Forrest truthfully was a witness whose testimony was like a roller coaster. Even on his direct, government notified, it was going in such a way and coming off so many statements that I notified the court that we may seek to treat him as an adverse witness. Then he basically came back, and then he went on cross, and he basically changed his statements again. So Forrest, I called him a defense-friendly witness. He really was. If you look at the government's rebuttal arguments, we said he was all over the place in his testimony. That said, there were portions of his testimony that were consistent with all these other cooperators' testimony, and they really did not have the same cross on Forrest as, for example, Jeffrey Scott. So turning to the harmless error argument on the 404B issue, what the government had was, it's common to have a cooperator or maybe two cooperators. It's unusual to have five cooperators, and that's what we had against Bell. Five cooperators and the mother of two of his children who testified about his all-cash, no ATM lifestyle. So, in fact, there was a very strong case against Bell, unusual in the sense that there were just so many different witnesses lining up against him who had provided that government that information separately at different times. And then on Walter, we had seven witnesses against him. So even though I think, see, I'm running out of time. Go ahead. I'd like to at least ask you, we need to pursue the 404B. I'm going to be serving them a little time, so go ahead. Because, Mike, I understand, I think, the general proposition, the notion of invited error and opening doors. But going through Bell's opening, the transcripts of Lipsy and Gwynn, and then the debate about what to do about the introduction of this 404B evidence and what to do about the instruction, it looks to me like you had misunderstood or misheard or misremembered what they actually said, because the opening is quite specific. No evidence of a transaction with anyone alleged to be involved in this conspiracy. And I was trying to think, okay, suppose the defense argues the government, in a bank robbery case, the government has no evidence other than a cooperator tying my guy into this bank robbery. The government can't respond by saying, well, yeah, but you committed a bank robbery a month earlier, right? First, on your question about the opening, Your Honor, I disagree. There were numerous times during the opening, and Mr. Brimley cited them in his reply, where the defense attorney said, in this conspiracy, in this conspiracy. But there were times in the opening, and then there were also, the big part, of course, was in the defense case where they decided to go much broader, and that's where they crossed the line from what would have been a reasonable, totally reasonable doubt defense. And I noted here on page 33 of the government's response that when Bell's attorneys, this is an opening, said, the evidence would show that law enforcement did dozens, if not hundreds, of controlled buys, where they sent officers to go purchase drugs in the street. Hundreds of controlled buys. First of all, we never did hundreds of controlled buys in the entire investigation. That was misleading. So you think that comment opened the door to 404B evidence? No, I don't. I think the opening of the door really happened when they took the step of calling the case agent, Officer Lipsy, and put him up there and asked him to go in great detail. And there's another point, Your Honor, where they went from just talking about this conspiracy, which is much smaller, and this huge investigation that we had done, and he specifically referenced Operation Blue Knight. Let me put it this way. Do you think it was unfair to argue there's no objective evidence that Bell was in any transactions within this conspiracy? With that limitation, is that an unfair argument by the defense? No. The objective evidence we had was financial evidence. Well, yeah, I mean, okay, be more specific, evidence of controlled buys, okay? Correct, yeah.  simply to ask the district judge to prevent them from making the broader argument that you think is unfair, rather than go in as this 404B thing. It looks like just pure propensity to me. I guess once that argument is out there, that they went so far as to describe all these controlled buys in great detail, more than 100, some of those weren't even the same drug, much less having to do with these. Many of them were crack cocaine buys. For them to just put that out there and suggest the government had this massive investigation, got all of these buys, most of which had nothing to do with this conspiracy, that implied that none of those controlled buys were into Bell, and it suggested they were going to make that argument. So why not prevent the argument rather than open? This is, with all respect, reading the argument, I didn't see a coherent argument as to why this was relevant to a relevant fact, probative of any relevant fact. It wasn't. It was not relevant until the defense made the investigation and the types of evidence that the government obtained relevant. We weren't planning on putting this in until they went forward with this defense, and then they started calling the government agents to basically talk about all of the evidence that was obtained in this very broad investigation, and the breadth of the investigation helped them, because if they focused it on this conspiracy, the answers would have been very different, and that's what they should have done. They made it broader, and I think the way that Judge Bucklow, the way that we handled this and that she allowed it to happen was reasonable, even if it wasn't the only way to do it. And then she followed, even though we didn't have the benefit of Gomez at this time, she followed Gomez by giving a jury instruction that was tailored to show exactly what they could consider it for and what they could not. Consider it to rebut an argument that was not made, right? Well, evidence that came in about the government's investigation, that they at least left the jury with that implication that none of that evidence was against. The government didn't have that type of evidence against Bell. If there aren't any other questions, the government would ask that the court affirm the convictions of both defendants. Do you have any other questions? All right. That will be fine. I will give you a minute, Mr. Brindley. Thank you, Your Honor. To begin with, I'd like to, that last point, if they were really worried about the claim that the government's worried about, then they could have done what this court suggested in Thomas and asked for a much more limited response. They could have asked the agent the question, well, were all of these controlled purchases part of this particular investigation, this particular conspiracy? The agent says, no, that eliminates the problem. They should do it in that limited way like this court said is appropriate in Thomas and not get in a prior act. With respect to the materiality issue on the Brady, the standard for the government isn't exactly what they knew, but what they knew or should have known based on that information. And the question they would ask if he says Forrest is out on the corner is, how do you know? Then you're going to have a confession from Nesbitt to them that they can hold over him in a new form of bias. That's what we should have gotten from them but didn't because they kept it from us and didn't ask the follow-up question that they're required to ask. The other thing in terms of materiality is if Nesbitt, we were told about this and we confronted Nesbitt, there is a strong possibility, or even Forrest, that he might have exercised his Fifth Amendment rights. If he did, his testimony would have to be excluded and we'd be talking about a mistrial, and that's a more than negligible possibility of a different outcome. That makes this material by itself. There was no indication ever given that while cooperating, Nesbitt was selling drugs. That did not happen. If I could just make one final point, the government argued that Nesbitt was so much better than these other people as a witness because they had these cooperation deals and they were worried about the government knowing they committed other crimes. If they had followed up on the question like they're required to do and asked how do you know when he said, well, I'm there doing it too, they would have had that same confession, we would have had that, and we would have been able to rebut the very argument they made about Nesbitt in close. That's why it's material. Thank you. Thank you. And you can rebut as well, Mr. Hatchell, for a minute. Thank you, Your Honor, and I agree with everything Mr. Brindley said. I just want to add one other point, and that goes to this issue that Judge Hamilton raised about seeing the light, and I just want to remind the court of what Judge Posner wrote in U.S.V. Boyd when he said, knowing that they were lying under oath about their using and dealing in the criminal activities of the defendants as well. That's the essence. We were asking, the defense was asking for this information, the government knew about it, it didn't turn it over. I've heard a lot of predictions about what the government thought would have happened had they turned it over. We don't know that. What we have to show is a reasonable probability of a different result. These were key witnesses, information the defense was asking for, information the government knew about, and they didn't give the defense. I think this court can easily conclude that there is a reasonable probability of a different result. Thank you. Thank you. And you were appointed, I believe, and we appreciate your assistance. Thanks to all counsel. We'll take the case under advisement.